CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

7/11/2022
JULIA C. DUDLEY, CLERK
BY: s/ A. Little
        DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

|  |  |  |
|---|---|---|
| **KIMBERLY H.[1],** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 6:21-CV-21** |
| | ) | |
| **KILOLO KIJAKAZI[2], Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Kimberly H. ("Kimberly") filed this action challenging the final decision of the

Commissioner of Social Security ("Commissioner") finding her not disabled and therefore

ineligible for Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"). 42

U.S.C. §§ 401–433. Kimberly alleges that the Administrative Law Judge ("ALJ") erred by: (1)

failing to properly determine her physical residual functional capacity ("RFC") and perform a

function-by function analysis; (2) concluding that her mental impairments are non-severe

impairments; and (2) assess her subjective allegations. I conclude that substantial evidence

supports the Commissioner's decision in all respects.  Accordingly, I **RECOMMEND**

**GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 20) and **DENYING**

Kimberly's Motion for Summary Judgment (Dkt. 16).

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence supports

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is hereby substituted for Andrew Saul as the defendant in this case.

the Commissioner's conclusion that Kimberly failed to demonstrate that she was disabled under the Act.[3] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). "The inquiry, as is usually true in determining the substantiality of evidence, is case-by-case." Biestek, 139 S. Ct. 1148. The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

## CLAIM HISTORY

Kimberly filed for DIB benefits in July 2019, claiming that her disability began on September 1, 2017. R. 15.[4] The state agency denied Kimberly's claims at the initial and reconsideration levels of administrative review. R. 69–113. ALJ Michael Dennard held a hearing on September 9, 2020, to consider Kimberly's claim for DIB, which included testimony from vocational expert Asheley Wells. R. 38–68.  Kimberly was represented by counsel at the hearing. On September 21, 2020, the ALJ entered his decision considering Kimberly's claim under the familiar five-step process[5] and denying her claim for benefits. R. 15–32.

The ALJ found that Kimberly suffered from the severe impairments of dermatitis, lower back pain or lumbago, diabetes mellitus, psoriathritis, osteoarthritis and joint pain of the fingers, elbows, wrists, ankles and knees, and obesity. R. 17. The ALJ determined that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 21–22. The ALJ concluded that Kimberly retained the residual functional capacity ("RFC") to perform light work, except that she can lift or carry 20 pounds occasionally and 10 pounds frequently; sit, stand and walk for 6 hours in an 8-hour workday; push or pull as much as she can lift or carry; occasionally operate hand controls, handle items, and finger items;

---

[4] Kimberly's date last insured was December 31, 2022; thus, she must show that her disability began on or before this date and existed for twelve continuous months to receive disability insurance benefits. R. 36; U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a).

[5] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the RFC, considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies.  42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

occasionally climb, balance, stoop, kneel, crouch, crawl; occasionally work at unprotected heights, in humidity, wetness, extreme cold and vibration. R. 22–23.

The ALJ determined that Kimberly was unable to perform her past relevant work as a claims clerk and front office cashier, but that she could perform other work that exists in the national economy such as usher, furniture rental clerk and gate guard. R. 31.  Thus, the ALJ concluded that Kimberly was not disabled. Id. Kimberly appealed and the Appeals Council denied her request for review on February 24, 2021. R. 1–6.

## ANALYSIS

### I.    Medical History and ALJ Decision

#### a.  Physical Impairments

Kimberly has a history of diabetes, migraines, psoriasis and hypothyroidism. Kimberly began complaining of lower back pain in December 2017, and was referred to physical therapy. R. 397.  Kimberly saw her endocrinologist in March 2018, and reported that she stopped using insulin because her diabetes were controlled with diet. R. 339–42.

Kimberly visited a dermatologist in December 2018, with complaints of psoriasis that had been previously unsuccessfully treated with topical steroids. R. 307–09. She reported lesions on her elbows, ankles, heels, and metacarpophalangeal joints that burn and sting.  She also reported joint pain in her hands, knees and ankles.  Theresa Mullins, D.O., assessed psoriasis associated with arthritis and began paperwork for the medication Enbrel. R. 311. Kimberly returned to the dermatologist in January and February of 2019, and received Kenalog injections for her psoriasis. R. 304–06.

Kimberly underwent a consultative examination with Okwuchukwu Obi, M.D., on February 17, 2019. R. 277. Kimberly reported a three-year history of diabetes, that she does not

4

check her blood glucose level regularly, and she has low blood sugar a few times a week. She takes oral medication, follows a diabetic diet and exercises regularly. She complained of numbness and tingling in her hands bilaterally and a dull, achy, burning, tingly pain in her hands and feet at an intensity of 5/10. Id. Kimberly also reported a history of psoriatic arthritis; Hashimoto's disease; migraines; occasional numbness and tingling in her hands; occasional swelling in her hands and knees; weakness; cramps; muscle spasms; stiffness; rash; itching; nausea; fatigue; and constant pain in her shoulders, elbows, hands, knees and feet. R. 278.

On exam, Kimberly had a steady gait, good hand/eye coordination, normal muscle bulk and tone, full strength in her extremities, normal sensation to pinprick and light touch, and symmetric reflexes. R. 280. Kimberly had no joint swelling, erythema, effusion, tenderness or deformity. She was able to button and unbutton a shirt, pick up a coin from a table, grasp a pen and write a sentence, lift, and carry and handle light objects.  She was able to squat and rise with ease, and walk on heels and toes. R. 281. Dr. Obi determined that Kimberly can be expected to sit, stand and walk normally in an 8-hour workday with normal breaks. R. 283. She can carry 20 pounds frequently and 30 pounds occasionally; and has no limitations on bending, stooping, crouching, squatting.  He also found no limitations with reaching, handling, feeling, grasping, fingering, pushing, or pulling. Id.

Kimberly continued to follow up with her dermatologist in March and June 2019 for scaly plaques over her elbows, wrists and ankles. She was injected with Kenalog and began the pre-authorization process for Humira. R. 299–304.

On September 12, 2019, state agency physician Jack Hutcheson, M.D., reviewed Kimberly's medical records and determined that she could perform light work with occasionally climbing ladders, ropes and scaffolds; frequently climbing ramps, stairs, stooping, kneeling,

crouching, and crawling; and unlimited balancing. R. 79.  He found no manipulative, visual or environmental limitations. Id. Dr. Hutcheson noted that Kimberly has psoriatic arthritis treated with injections and Humira; she denied back or joint pain at a recent exam; had full strength at her consultative exam; her range of motion is within normal limits; and she handles personal care, drives and shops. Id.

On November 13, 2019, state agency physician Catherine Howard, M.D., reviewed Kimberly's records and agreed with Dr. Hutcheson's conclusions that Kimberly can perform light work. R. 95–97.

Kimberly followed up with her dermatologist in December 2019, after being on Humira for about 6 months, and reported that her psoriasis hasn't changed much and she still has joint pain, stiffness, and lesions on her elbows, hands, knees, ankles and feet. R. 1058. Kimberly was advised to continue Humira while waiting for approval of the medication Taltz. Id.  On March 26, 2020, Kimberly reported to Clay Pickard, M.D., that she noticed an improvement in her psoriasis over the last couple of weeks. R. 1050.  She continued to complain of joint pain in her hands, feet and back, but her pain was stable after starting Enbrel.  She was still ramping up her Enbrel doses from two weeks to weekly injections, and Dr. Pickard noted that it takes many weeks to see improvement with Enbrel. Id.

Kimberly had a consultation with rheumatologist Jeff Croteau, M.D., on September 1, 2020, and reported ongoing psoriasis symptoms while taking Enbrel twice a week. She reported pain in her fingers and toes, and sometimes elbows. R. 1067.  On exam, Kimberly had pink plaques on her hands, elbows and shins. R. 1073. She moved all four extremities without difficulty, could stand from seated position without weakness, and had a non-antalgic gait. Kimberly had a good range of motion in her shoulders, elbows, wrists, knees and ankles. She had

no significant arthritic deformities in her hands, a slight angulation in her bilateral 5th finger

distal phalanges that appeared physiologic rather than pathologic; she could close her fists; had

no MCP compression tenderness; her joints were non-tender to deep palpation; and she had no

joint swelling, erythema, or warmth. Id. Dr. Croteau noted that Kimberly's exam does not show

joint synovitis, dactylitis, or sequelae/deformity of chronic, uncontrolled inflammatory

arthropathy. R. 1077. Dr. Croteau found it surprising that two excellent medications for psoriatic

arthritis would not improve Kimberly's joint pain if it were truly psoriatic arthritis.  He noted

that it "seems unlikely in this scenario that her arthralgia represents active inflammatory

arthropathy."  He concluded that Kimberly's arthralgias are most consistent with osteoarthritis.

Id.

### b.  Mental Impairments

Kimberly has a history of anxiety that is treated with medication prescribed by Jennifer

Adkins, P.A. at Brambleton Family Practice. R. 431. In February 2017, Kimberly reported that

her moods were doing well on Effexor, she feels that she is dealing with stress better, and she is

sleeping well. R. 431–433.  Kimberly followed up in June 2017, and reported that she lowered

her dose of Effexor and she feels "a lot better." R. 425. She reported some anxiety at times, but

she is able to manage it with things like deep breathing. Id.  In August, Kimberly reported that

she was still feeling better on the lower dose of Effexor, but experienced some situational anxiety

when there are large groups of people. R. 413.  She reported avoiding shopping, and that her

emotional support dog really helps. Id.

Kimberly stopped taking Effexor due to pregnancy, and reported in December 2017 that

her anxiety was well-managed without medication, but she still experiences a lot of anxiety in

public. R. 395.  Ms. Adkins recommended counseling for her social anxiety. R. 397. In July

2018, Kimberly continued not taking medication for her anxiety and reported that she "has a better handle on her anxiety. She isn't having the panic episodes like previous because she can better identify her triggers. Denies any worsening depression since she had the baby." R. 315.

On October 24, 2018, Kimberly underwent a psychological examination with Marvin Gardner, Ph.D. R. 270. Kimberly reported living with her husband and children, seeing friends "on occasion," going to church "each Sunday and Wednesday," doing "everything around the house," shopping for groceries and cooking, and taking care of her bills and finances. R. 271. She reported that her symptoms were a "little bit better." Id. Kimberly was not currently taking medication for her anxiety.

During the examination, Kimberly described her recent mood as "very anxious," and reported panic attacks 3 or 4 times a week triggered by negative thoughts, someone ringing her doorbell, or somebody going by her house. R. 273. Dr. Gardner diagnosed generalized anxiety disorder and posttraumatic stress disorder. R. 274. Dr. Gardner noted that Kimberly's anxiety may be related to her thyroid, which is likely somewhat improved at this time. He also noted that she made no mention of social anxiety, reporting having lots of friends while in school and attending church every week. Id.

Dr. Gardner determined that Kimberly can perform simple, repetitive work tasks, maintain regular attendance in the workplace, perform work activities on a consistent basis, has normal intelligence, can perform work activities without special or additional supervision, and can complete a normal workday or workweek without interruptions from her psychiatric condition. R. 275. Dr. Gardner determined that Kimberly can accept instructions from supervisors, interact with co-workers and the general public with no more than a moderate

impairment of social interaction due to her anxiety disorder and can deal with the usual stresses encountered in competitive work when adherent to psychiatric treatment. Id.

On July 10, 2019, Kimberly saw Ms. Adkins and reported worsening anxiety over the past several weeks, feeling worried all the time, and some episodes of panic. R. 296. Ms. Adkins prescribed Buspar and recommended counseling. R. 298.  In September 2019, Kimberly reported that she stopped taking Buspar because it made her dizzy, and she found cognitive behavioral therapy to be effective. R. 994.  Ms. Adkins prescribed Ativan to use as needed. R. 996.  In December 2019, Kimberly reported that the Ativan was not effective for her, she is having trouble sleeping, and feels irritated a lot. R. 1041. Christy Arthur, M.D., prescribed Paxil for generalized anxiety disorder. R. 1046.  In January 2020, Kimberly reported some improvement with Paxil, but still complained of excess worry. R. 1040. A month later, Kimberly's anxiety was improved on Paxil, R. 1030, and in April 2020, she reported improvement with her anxiety on Paxil but continued situational anxiety when she is in public places. R. 1029. She also reported additional worry related to the pandemic. Id.

On September 11, 2019, state agency psychologist Jo McClain, Psy.D., reviewed Kimberly's records and determined that her mental impairments were not severe impairments and caused no more than mild limitations in the domains of understanding, remembering or applying information; interacting with others; concentration, persistence or maintaining pace; and adapting or managing herself. R. 76.  On November 13, 2019, state agency psychologist Daniel Walter, Psy.D., reviewed Kimberly's records and agreed with Dr. McClain's conclusions that Kimberly's mental impairments are non-severe. R. 92.

II.     **Function-by-Function Analysis**

Kimberly asserts that the ALJ's analysis does not comply with SSR 96-8p. Specifically,
Kimberly argues that the ALJ failed to make specific findings whether her impairments would
cause her to experience episodes of pain and require breaks; ignored evidence from Dr. Croteau
regarding her psoriasis and pain in her hands that did not improve with medication; and failed to
assess her ability to sustain work activities on a regular basis for an 8-hour day. Pl. Br. Summ. J.
pp. 20–21.

Kimberly's argument in this section of her brief cites no medical records or other
evidence in support of her claim, aside from the assertion that the medical records document her
consistent complaints of psoriasis over her elbows, ankles, heels, and fingers with joint pain. Id.
at p. 20. Kimberly's arguments in this section of her brief amount to a disagreement over the
ALJ's characterization of her treatment history. Attacking whether substantial evidence exists
requires more than simply identifying medical records or statements that are inconsistent with
the ALJ's findings.  A claimant must show that the ALJ used an improper legal standard, did not
consider a relevant portion of the record, did not satisfy the duty of explanation, or the
overwhelming weight of inconsistent evidence overcomes the substantial evidence standard.  The
Fourth Circuit is clear that an ALJ's findings "as to any fact, if supported by substantial
evidence, shall be conclusive." Hart v. Colvin, No. 5:169cv32, 2016 WL 8943299, at *3
(N.D.W. Va. Sept. 14, 2016) (quoting Walls v. Barnhart, 296 F. 3d 287, 290 (4th Cir. 2002)).
Kimberly's arguments essentially request that the court reweigh the evidence, which I am not
permitted to do. The issue before me is whether the ALJ applied correct legal standards and his
factual findings are supported by substantial evidence. Bird v. Comm'r of Soc. Sec. Admin., 699
F.3d 337, 340 (4th Cir. 2012).

SSR 96-8P requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. Mascio v. Colvin, 780 F.3d. 632, 636 (4th Cir. 2015).  The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8P, 1996 WL 374184, at *7 (S.S.A. July 2, 1996);[6] Monroe v. Colvin, 826 F.3d 176, 189, (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often).

A function-by-function analysis requires the ALJ to develop an adequate RFC that accounts for the work activities the claimant can perform given the physical or mental impairments affecting her ability to work. Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. See SSR 96-8P, 1996 WL 374184, at *7. The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. Id.

---

[6] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1).  Once published, these rulings are binding on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20 C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weightlifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D. W. Va. Apr. 29, 2015).

Here, the ALJ performed the required function-by-function analysis. The ALJ reviewed Kimberly's medical records in detail (R. 23) and the multiple physician opinions in the record. R. 26–28. The ALJ analyzed Kimberly's symptoms and found that her statements concerning the intensity, persistence and limiting effects were not entirely consistent with the evidence in the record. R. 28. The ALJ noted that Kimberly's psoriasis was treated with injections of Humira and Enbrel; that two injections of Enbrel a week seemed to control her psoriasis, but the rashes and joint pain worsened when she lowered to one injection a week. R. 29. The ALJ noted that Kimberly had osteoarthritis with joint pain, swelling or stiffness in multiple locations of her body, and she was prescribed medication by a rheumatologist. R. 29. The ALJ noted that Kimberly's lumbago was treated with physical therapy, a home exercise program and pain medication; and her diabetes was usually controlled with medication, insulin, diet changes and exercise. The ALJ noted that Kimberly had no emergency department visits or hospitalizations for her impairments, and no recommendations for surgery or other invasive procedures.

Kimberly's physical examinations were normal, aside from tenderness, swelling and reduced range of motion in her low back, knee, ankle, wrist, and finger joints during flares.  Overall, the ALJ noted that Kimberly's physical impairments were treated routinely, conservatively, and successfully.

Regarding Kimberly's functioning, the ALJ noted that Kimberly gave birth to a child and cared for a newborn during the alleged period of disability; she mentioned attending college for a bachelor's degree; and she mentioned having her own company designing t-shirts in 2017 and 2018. Kimberly also reported caring for her children, preparing simple meals, grocery shopping, and attending church. Id.

The ALJ also noted that Kimberly often said her impairments were stable or controlled on medication or injections. For example, Kimberly reported that her psoriasis was controlled with two injections of Enbrel a week; her diabetes was controlled with insulin; she stopped seeing an endocrinologist for diabetes in mid-2019, and stopped complaining of low back pain in 2017.

The ALJ further noted that Kimberly complained of symptoms related to her psoriasis and osteoarthritis for many years before her alleged disability onset date, during which she worked as a claims clerk and front office cashier. R. 29. The ALJ found that Kimberly's objective examinations and subjective complaints do not reflect that her impairments became notably worse since her alleged onset date in 2017, which suggests that they did not prevent her from working.  The ALJ also found it significant that Kimberly's treating practitioners did not place limits on her functioning or state that she is unable to work. R. 30.

The ALJ reviewed Kimberly's medical history and subjective allegations in detail, and provided a detailed and extensive RFC limiting Kimberly to a range of light work.  Those

specific limitations were included in the hypothetical the ALJ posed to the vocational expert, and the vocational expert testified that someone with those restrictions could perform jobs in the national economy. R. 64–65.  The ALJ imposed more restrictive physical limitations than those suggested by the medical opinions in the record.

The ALJ is not required to make specific findings related to each of Kimberly's subjective assertions.  See Shinaberry v. Saul, No. 18-2096, 2020 WL 908887, at *6 (4th Cir. Feb. 26, 2020), (ALJ did not err in refusing to fully credit claimant's subjective statements regarding her physical limitations where claimant pointed to no medical evidence in support of a limitation.).  The ALJ was only required to create a narrative discussion that builds "an accurate and logical bridge from the evidence to his conclusion," which the ALJ did in his discussion of the medical and non-medical evidence, Kimberly's alleged symptoms, and the medical opinions of record. Kimberly's complaints of pain were acknowledged and considered by the ALJ, and the ALJ provided reasoning for his conclusion that despite her physical impairments, Kimberly could perform a limited range of light work.  The ALJ's RFC is, by definition, a determination of what Kimberly can perform on a "regular and continuing basis," meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." See 20 C.F.R. §§ 404.1545(b); SSR 96-8, 1996 WL 374184, at *1-2.

Thus, the ALJ provided a narrative discussion explaining his conclusions and the evidence that contradicts the RFC determination, cited specific medical facts and non-medical evidence supporting his conclusion, discussed Kimberly's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, and described the maximum amount of each work-related activity that Kimberly can perform. As noted above, an

ALJ's narrative discussion of all the evidence in support of his findings in determining a

claimant's RFC is sufficient to comply with the function-by-function analysis under SSR 96-8P.

### III.    Severe Impairments

Kimberly asserts that the ALJ erred by finding that her mental impairments are non-

severe. Kimberly argues that her anxiety and PTSD cause more than minimal limitations on her

ability to perform basic mental work activities, since she has difficulty leaving her home and

interacting with others. Pl. Br. Summ. J. p. 23.  Kimberly asserts that the ALJ failed to explain

why her anxiety and PTSD are not severe impairments, and that the ALJ did not explain why he

failed to adopt Dr. Gardner's opinion that her mental impairments are severe.

The ALJ reviewed Kimberly's mental impairments in step two of the decision, and

determined that her anxiety and PTSD do not cause more than minimal limitation in her ability to

perform basic work activities. R. 18. The ALJ reviewed each domain of functioning in detail.

R. 18–19.  Specifically, regarding interacting with others, the ALJ recognized that Kimberly

reported anxiety, but that it was stabilizing with medication. R. 19. Kimberly's providers noted

that she was pleasant, cooperative and in no distress when taking her medication such as Effexor.

Kimberly reported going out in public to grocery shop and attend church. Kimberly also reported

socializing with family members in and outside of the home, and generally did not complain of

serious problems with interpersonal interaction. R. 19.

The ALJ noted that Kimberly's mental status was usually normal at her treatment visits,

and she had normal insight, judgment, concentration, memory, mood and affect when taking her

psychiatric medications. R. 20.

The ALJ reviewed Dr. Gardner's consultative opinion in step four of the decision, which

found that Kimberly's mental impairments did not limit her ability to work, aside from "[s]he is

able to interact with co-workers and with the general public with no more than a moderate

impairment of social interaction due to her anxiety disorder." R. 275.  The ALJ found Dr.

Gardner's opinion persuasive as it was generally consistent with and supported by the medical

evidence, but concluded that Kimberly had only a mild limitation in social interaction due to her

anxiety disorder.  R. 28.  The ALJ explained this finding, stating:

> She had non-severe anxiety and PTSD with mild limitations in all of the "B" criteria.
> Her mental symptoms were usually controlled with medication at a primary care
> provider.  Although she discussed starting cognitive behavioral therapy, there were no
> records of her attending any session.  She had no psychiatric admissions. Mental status
> examinations were generally within normal limits.  The claimant discussed giving birth
> and caring for a baby in May of 2018, working on a bachelor's degree in business
> administration, and having her own t-shirt company.  Although she said she had anxiety
> around others, she was able to shop for groceries and attend church.  In addition, Dr.
> Gardner had interviewed the claimant, reviewed her mental records, and had experience
> with the rules and regulations of the disability determination process.

R. 28.

The ALJ also reviewed the opinions of Drs. McClain and Walter that Kimberly's mental

impairments were non-severe, and found them persuasive. R. 27.  The ALJ noted that the

opinions were generally consistent with and supported by the mental evidence of record,

including Kimberly's lack of psychiatric admissions, failure to attend cognitive behavioral

therapy, normal mental status examinations, ability to shop for groceries and attend church. The

ALJ also noted that Drs. McClain and Walter reviewed the mental records available and are

familiar with the disability determination process. Id.

Thus, the ALJ reviewed Kimberly's mental health records, subjective complaints,

activities, and the physician opinions in detail, and determined that her anxiety and post-

traumatic stress disorder do not cause more than a minimal limitation in her ability to perform

basic mental work activities and are non-severe. R. 18. The ALJ explained the reasoning for this

decision, and it is supported by the state agency opinions and Kimberly's mental health records.

16

The ALJ explained why he adopted all but one of Dr. Gardner's findings regarding Kimberly's mental health limitations. Accordingly, the ALJ's decision regarding Kimberly's mental health impairments is supported by substantial evidence.

## IV.    Subjective Allegations

Kimberly also asserts that the ALJ improperly discounted her allegations because they are not consistent with objective evidence in the record, citing to Arakas v. Commissioner, 983 F.3d 83 (4th Cir. 2020). Pl. Br. Summ. J. p. 24. Kimberly is correct that objective evidence is not required to find a claimant disabled. However, that does not require an ALJ to accept without question a claimant's complaints of disabling pain from impairments that do not always have objective markers.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c). First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain. Id. at *3, §§ 404.1529(b), 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. Id. §§ 404.1529(c), 416.929(c). At this step, objective evidence is not required to find the claimant disabled. Thus, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id.

A reviewing court gives great weight to the ALJ's assessment of a claimant's statements and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions.  See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984).  Further, a reviewing court will defer to the ALJ's credibility finding except in those "exceptional" cases where the determination is unclear, unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.  See Bishop v. Comm'r of Soc. Sec., 583 Fed. Appx. 65, 68 (D. Md. May 4, 2016) (citing Edeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997)).

Substantial evidence supports the ALJ's determinations regarding Kimberly's allegations. The ALJ reviewed Kimberly's testimony in detail, along with the evidence of record. The ALJ found that Kimberly's statements concerning the limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. R. 28.  There is extensive objective evidence of Kimberly's impairments and associated limitations in the record. The ALJ reviewed this evidence in detail, noting objective evidence of Kimberly's osteoarthritis with joint pain, swelling and stiffness in her elbows, fingers, wrists, ankles and knees; lumbago; and psoriasis. R. 28–29. The ALJ found that Kimberly's treatment was routine and conservative, and generally successful controlling her symptoms. R. 28. Indeed, the records reflect that Kimberly's conditions were controlled with medication, and that despite her occasional tenderness, swelling, or reduced range of motion during a flare up of psoriasis, she had normal muscle strength, reflexes and overall range of motion at the majority of her treatment visits.

Kimberly's effort to apply Arakas is unavailing in this case. Here, Kimberly's physical complaints of pain primarily resulted from her osteoarthritis, psoriasis and lumbago, all of which are apparent and confirmed by objective testing. These physical impairments are not comparable to conditions such as fibromyalgia, that was at issue in Arakas, and that are not identified

18

through objective testing. In <u>Arakas</u>, the plaintiff experienced pain from a condition that did not

create objective findings, and the Fourth Circuit found that the ALJ erred by relying on the

absence of such findings to discount the plaintiff's subjective statements. Here, there is a

plethora of objective evidence relating to Kimberly's impairments and resulting limitations. The

ALJ recognized that Kimberly suffered from pain and limited her to light work with specific

restrictions on her ability to push/pull, operate hand controls, handle items, finger items, and

other postural and environmental limitations. The ALJ provided a more restrictive RFC than any

recommended by the physician opinions in the record.  <u>See</u> <u>Walker v. Saul</u>, No. 2:20-cv-00196,

2021 WL 342570, at *10 (S.D.W. Va. Jan. 6, 2021) ("[T]he ALJ did not discount [c]laimant's

subjective complaints based on the lack of objective evidence, but instead properly considered

numerous factors, including [c]laimant's daily activities"). <u>Cf.</u> <u>Arakas</u>, 983 F.3d at 97 ("Thus,

while the ALJ may have considered other evidence, his opinion indicates that the lack of

objective medical evidence was his chief, if not definitive, reason for discounting Arakas's

complaints.").

Kimberly also alleges that the ALJ considered her daily activities without

acknowledging the extent to which they were performed. Pl. Br. Summ. J. p. 27–29. This is not a

situation like <u>Brown v. Comm'r</u>, 873 F.3d 251 (4th Cir. 2017), where the ALJ overly relied upon

minimal daily activities in evaluating the claimant's subjective complaints. Here, the ALJ noted

that Kimberly reported giving birth to a child and caring for a newborn during the period of

disability; attending college for a bachelor's degree in business administration; having her own

company designing t-shirts; caring for her children, preparing simple meals, shopping for

groceries, and attending church. R. 29. The ALJ found these activities not limited to the extent

one would expect given Kimberly's allegations of disabling limitations. <u>Id.</u>

The ALJ pointed to more than Kimberly's daily activities to discount her subjective allegations, as set forth above.  Beyond these activities, the ALJ concluded that Kimberly's allegations were inconsistent with her medical records, overall treatment history, physician opinions in the record, and the lack of restrictions recommended by her treating physicians. The ALJ's opinion was thorough and applied the proper legal standard, and I will not re-weigh the evidence. See Ladda v. Berryhill, 749 Fed. Appx. 166 (4th Cir. Oct. 18, 2018) (upholding the ALJ's credibility determination because the ALJ explained his reasoning and weighed the claimant's subjective statements against other evidence.) Accordingly, I conclude that the ALJ supported his analysis of Kimberly's subjective complaints with substantial evidence.

## CONCLUSION

I **RECOMMEND** entering an order **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Norman K. Moon, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record.  Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof.  Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties.  Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such

objections, including the waiver of the right to appeal.

Entered: July 11, 2022

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge