CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

9/30/2022

LAURA A. AUSTIN, CLERK
BY:  s/ CARMEN AMOS
     DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| KIMBERLY H.,[1] | CASE NO. 6:21-cv-21 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security[2] | JUDGE NORMAN K. MOON |
| *Defendant.* | |

## I.    Introduction

This matter is before the Court on the Parties' cross motions for summary judgment.

Dkts. 16, 20. Pursuant to Standing Order 2011-17 and 28 U.S.C. § 636(b)(1)(B), the Court

referred this matter to Magistrate Judge Robert S. Ballou for proposed findings of fact and a

recommended disposition. In his Report and Recommendation ("R&R"), Judge Ballou

determined that the Commissioner of Social Security ("Commissioner")'s final decision was

supported by substantial evidence and advised this Court to (1) deny Kimberly's motion and (2)

grant the Commissioner's motion. Dkt. 22 at 1. Kimberly timely filed her objections, Dkt. 23,

obligating the Court to undertake a *de novo* review. *See* 28 U.S.C. § 636(b)(1)(C); *Farmer v.*

*McBride*, 177 F. App'x 327, 330 (4th Cir. 2006). The Commissioner also filed a timely response

---

[1] The Committee on Court Administration and Case Management of the Judicial
Conference of the United States has recommended that, due to significant privacy concerns in
social security cases, federal courts refer to claimants only by their first names and last initials.

[2] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.
Pursuant to Fed. R. Civ. P. 25(d), Kilolo Kijakazi is substituted for Andrew Saul as Defendant in
this case.

to Kimberly's objections. Dkt. 25. The Court finds that Kimberly's objections are without merit and adopts Judge Ballou's R&R in full.

## II.     Standard of Review

Objections to a magistrate judge's R&R under Federal Rule of Civil Procedure 72(b) "train[] the attention of both the district court and the court of appeals upon only those issues that remain in dispute after the magistrate judge has made findings and recommendations." *United States v. Midgette*, 478 F.3d 616, 621 (4th Cir. 2007) (citing *Thomas v. Arn*, 474 U.S. 140, 147–48 (1985)). The district court must determine *de novo* any portion of the magistrate judge's R&R to which a proper objection has been made. Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C); *Farmer*, 177 F. App'x at 330–31.

The Court must affirm the Administrative Law Judge ("ALJ")'s factual findings if they are supported by substantial evidence and were reached through application of the correct legal standard. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019); *Bird v. Comm'r of Soc. Sec.*, 669 F.3d 337, 340 (4th Cir. 2012). Substantial evidence requires more than a mere scintilla of evidence, but less than a preponderance. *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). A finding is supported by substantial evidence if it is based on "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). The Court may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of the ALJ, *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012), and must defer to the ALJ's decision where "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled," *Johnson*, 434 F.3d at 653. However, a reviewing court should not "reflexively rubber-stamp an ALJ's findings," *Lewis v. Berryhill*, 858 F.3d 858, 870 (4th Cir.

2017). An ALJ must "build an accurate and logical bridge" from the evidence in the record to his conclusions. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

"Ultimately, it is the duty of the [ALJ] reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Thus, even if the Court would have made contrary determinations of fact, it must nonetheless uphold the ALJ's decision, so long as it is supported by substantial evidence. *See Whiten v. Finch*, 437 F.2d 73, 74 (4th Cir. 1971).

### III.   Background

#### A.  The ALJ Decision

In July 2019, Kimberly filed for disability insurance benefits ("DIB") under the Social Security Act ("Act") 42 U.S.C. §§ 401–403. Administrative Record ("R.") 15. She claimed that her disability began on September 1, 2017. *Id.* Because she currently has insurance through December 31, 2022, she must demonstrate that her disability began before or on this date and existed for twelve continuous months to receive DIB. *Id.*; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied her applications at the initial review and on reconsideration. R. 69–113.

On September 9, 2020, the ALJ held a hearing to consider Kimberly's claim for DIB, R. 37–68, and on September 21, 2020, the ALJ denied her claim for DIB, R. 15–32. In making this decision, the ALJ worked through the standard five-step inquiry to determine if Kimberly was disabled by considering whether she (1) was engaged in substantial gainful activity ("SGA");[3]

_____

[3] "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is

(2) had a severe medical impairment; (3) had an impairment listed or equivalent to one listed in the Act's regulations; (4) could return to her past relevant work based on her residual functional capacity ("RFC"); and, if she could not, (5) whether she could perform other work based on her RFC. 20 C.F.R. § 404.1520(a)(4); *see Lewis*, 858 F.3d at 861. "The burden of proof lies with the claimant during the first four steps but shifts to the Commissioner at step [five]." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 90 (4th Cir. 2020) (citing *Lewis*, 858 F.3d at 861).

In applying the five-step inquiry, the ALJ found at step one that Kimberly met the insured status requirements of the Act and that she had not engaged in substantial gainful activity since September 1, 2017, the alleged onset date. R. 17. At step two, the ALJ found that Kimberly had "severe" impairments of dermatitis, lower back pain or lumbago, diabetes mellitus, psoriathritis, osteoarthritis, and joint pain of the fingers, elbows, wrists, ankles, and knees, and obesity. *Id.* But he found that her anxiety and post-traumatic dress disorder ("PTSD") were non-severe impairments. R. 18. At step three, the ALJ found that she "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." R. 21 (citing 20 CFR §§ 404.1520(d), 404.1525, 404.1526).

At step four, the ALJ concluded that Kimberly could not return to past relevant work as a claims clerk and front office cashier based on the RFC findings. R. 30. The ALJ specifically found that she had the RFC to perform light work "except she can lift or carry twenty pounds occasionally and ten pounds frequently." R. 22. In the RFC determination, he also found that she could sit, stand, or walk for six hours in an eight-hour workday, "push or pull as much as she can lift or carry," and "operate hand controls [and handle items] with the left hand and right hand

---

usually done for pay or profit, whether or not, a profit is realized. 20 C.F.R. §§ 404.1572(b), 416.972(b).

occasionally." *Id.* He further found that Kimberly could "finger items occasionally with the left hand and right hand," "occasionally climb, balance, stoop, kneel, crouch and crawl," and "occasionally work at unprotected heights, in humidity, in wetness, in extreme cold, and in vibration." R. 22–23.

Having concluded that Kimberly was unable to perform past relevant work, the ALJ proceeded to step five and found that Kimberly could perform work that contributes to the national economy, such as working as an usher, a furniture rental clerk, and a gate guard, based on the RFC findings. R. 31 (finding "there are jobs that exist in significant numbers in the national economy that the claimant can perform"). Based on these findings, the ALJ concluded that Kimberly was not disabled. R. 32. On February 24, 2021, the Appeals Counsel denied Kimberly's request for review. R. 1–6.

### B.  The R&R

In the R&R addressing the Parties' cross motions for summary judgment, Dkts. 16, 20, the magistrate judge determined that the ALJ's final decision was supported by substantial evidence. Dkt. 22. The magistrate judge considered Kimberly's challenges to (1) the ALJ's function-by-function analysis, (2) the ALJ's determination that her mental impairments were not severe, and (3) the ALJ's determination on her allegations. *See id.*

Regarding the first challenge, the magistrate judge found that the ALJ applied the correct legal standard for his function-by-function analysis and that his factual findings were supported by substantial evidence. *Id.* at 10–15. For the second challenge, the magistrate judge found substantial evidence to support the ALJ's conclusion that her mental impairments were non-severe. *Id.* at 15–17. For the last challenge, the magistrate judge found substantial evidence to support the ALJ's determination regarding Kimberly's allegations, noting specifically that there

was extensive evidence to support his determination that "Kimberly's statements concerning the limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 17–20.

### C.  Medical History Overview

#### i.  Physical Impairments

Kimberly has a medical history of diabetes, migraines, psoriasis, and hypothyroidism. In December 2017, Kimberly began experiencing lower back pain and was referred to physical therapy. R. 397. In March 2018, she saw her endocrinologist and stated that she had stopped using her insulin because her diabetes was under control with her diet. R. 339–40.

In December 2018, Kimberly met with a dermatologist and complained that her psoriasis had been unsuccessfully treated with topical steroids. R. 307–09. She stated that she had lesions on her elbows, ankles, and heels; metacarpophalangeal joints; and joint pain in her hands, knees, and ankles. R. 309. Theresa Mullins, D.O., determined that Kimberly had psoriasis associated with arthritis and started paperwork for the medication Enbrel. R. 311. In January and February 2019, Kimberly visited the dermatologist again and received Kenalog injections for her psoriasis. R. 304–06.

On February 17, 2019, Kimberly had a consultation examination with Okwuchukwu Obi, M.D., in which she reported a three-year history of diabetes, that she did not check her blood glucose level regularly, and that she had lower blood sugar occasionally in a week. R. 277. She stated that she took oral medication, maintained a diabetic diet, and exercised regularly. *Id.* She noted that she experienced numbness and tingling in her hands bilaterally and a dull, achy, burning, tingly pain in her hands and feet at an intensity of 5/10, although at the time of the examination, she reported a pain intensity of 7/10. *Id.* She also reported that she had a nine-year

history of psoriatic arthritis; Hashimoto's disease; migraines; occasional numbness and tingling in her hands; occasional swelling in her hands and knees; weakness; cramps; muscle spasms; stiffness; rash; itching; nausea; fatigue; and constant pain in her shoulders, elbows, hands, knees, and feet. R. 278.

During the exam, Kimberly maintained a steady gait and good hand and eye coordination, and she had normal muscle bulk and tone, full strength in her extremities, normal sensation pinprick and light touch, and symmetric reflexes. R. 280–81. She did not have any joint swelling, erythema, effusion, tenderness, or deformity. R 281. She was able to button and unbutton a shirt; pick up a coin from a table, grasp a pen and write a sentence; lift, carry, and handle light objects; squat and rise with ease; and walk on her heels and toes. *Id.* Based on this exam, Dr. Obi found that Kimberly can be expected to sit, stand, and walk normally in an eight-hour workday with normal breaks and be able to carry twenty pounds frequently and thirty pounds occasionally. R. 283. He further found that she had no limitations on bending, stopping crouching, squatting, reaching, handling, feeling, grasping, fingering, pushing, or pulling. *Id.*

In March and June 2019, Kimberly visited her dermatologist to discuss the scaly plaques over her elbows, wrists, and ankles. R. 299–304. She received Kenalog injections and started pre-authorization process for Humira. *Id.*

State agency physician Jack Hutcheson, M.D., reviewed Kimberly's medical records on September 12, 2019. R. 78–82. He determined that Kimberly could perform light work that included being able to occasionally climb ladders, ropes, and scaffolds. R. 79, 81. He concluded that she could frequently climb ramps and stairs, and stoop, kneel, crouch, crawl, and have unlimited balance. *Id.* Dr. Hutcheson also found that she had psoriatic arthritis and Humira, but that she had full strength and a range of motion within normal limits during the exam. *Id.* Dr

Hutcheson noted that Kimberly denied back or joint pain on a recent exam and that she handled personal care, driving, and shopping for groceries. *Id.* On November 13, 2019, state agency physician Catherine Howard, M.D., reviewed Kimberly's medical records and agreed with Dr. Hutcheson's determination that she could perform light work. R. 95–97.

In December 2019, Kimberly met with her dermatologist after taking Humira for approximately six months. R. 1058. She reported that her psoriasis had not changed much and that she still had joint pain, stiffness, and lesions on her elbows, hands, knees, ankles, and feet. *Id.* Her dermatologist recommended that she continue taking Humira until approved for the medication Taltz. *Id.* Kimberly visited Clay Pickard, M.D., on March 26, 2020, and reported that she noticed an improvement in her psoriasis during the last couple of weeks. R. 1050. She complained of continued joint pain in her hands, feet, and back, but her pain was stable after starting Enbrel. *Id.* Dr. Pickard told Kimberly that it can take many weeks to see improvement with Enbrel. *Id.*

On September 1, 2020, Kimberly consulted with rheumatologist Jeff Croteau, M.D., and informed him about (1) ongoing psoriasis symptoms while taking Enbrel twice a week and (2) pain in her fingers and toes, and sometimes elbows. R. 1067. Examination indicated that Kimberly had pink plaques on her hands, elbows, and shins. R. 1073. She could move all four extremities without difficulty, could stand from a seated position without weaknesses, and had a non-antalgic gait. *Id.* She had a good range of motion in her shoulders, elbows, wrists, knees, and ankles, and she did not have significant arthritic deformities in her hands and had no joint swelling, erythema, or warmth. *Id.* She also had a slight angulation in her bilateral fifth finger distal phalanges that appeared physiologic rather than pathologic; she could close her fists; had no MCP compression tenderness; and her joints were non-tender to deep palpation. *Id.* Dr.

8

Croteau found that her exam did not show joint synovitis, dactylitis, sequelae/deformity of chronic, or uncontrolled inflammatory arthropathy. R. 1077. However, he found it surprising that two excellent medications for psoriatic arthritis would not improve Kimberly's joint pain "if it were truly psoriatic arthritis." *Id.* He thus found that Kimberly's arthralgias was most consistent with osteoarthritis. *Id.*

### ii.   Mental Impairments

Kimberly has a history of anxiety that has been treated with medication prescribed by Jennifer Adkins, P.A., R. 431. On February 22, 2017, Kimberly told Ms. Adkins that her moods were doing well on the medication Effexor, that she dealt better with stress, and that she was sleeping well. R. 431–32. In June 2017, she reported that she had lowered her dose of Effexor and felt much better on the lower dose. R. 425. She also reported that she experienced some anxiety, but "fe[lt] she [was] able to manage that with things like deep breathing." *Id.* Kimberly, on August 28, 2017, reported that her emotional support dog helped with anxiety, but that she still had some situational anxiety in large groups of people and had been avoiding "going out shopping." R. 413.

On December 4, 2017, Kimberly reported that she had made a personal decision to stop taking Effexor due to her pregnancy. R. 395. However, she reported that her "anxiety ha[d] been well managed without medication," but that she still experienced lots of anxiety when in public. *Id.* Ms. Adkins advised her to undertake counseling for her social anxiety. R. 397. In July 2018, Kimberly reported that she had continued not taking medicine for her anxiety and that she "ha[d] a better handle on her anxiety," was not "having the panic episodes like previous because she can better identify her triggers," and "[d]enie[d] any worsening depression since she had [her] baby." R. 315.

On October 24, 2018, Marvin Gardner, Ph.D., conducted a psychological examination of Kimberly. R. 270. Kimberly reported that she was visiting a few friends occasionally, going to church "each Sunday and Wednesday," doing "everything around the house," shopping for groceries and cooking, and taking care of her bills and finances. R. 271. Kimberly provided that she was not currently taking any medication for her anxiety and that her symptoms were a "little bit better." *Id.* On exam, Kimberly stated that her recent mood was "very anxious" and reported panic attacks three or four times a week and that she cried "sometimes twice a day." R. 273. Dr. Gardner diagnosed her with generalized anxiety disorder and PTSD. R. 274. He found that her anxiety may be related to her thyroid, which was likely to somewhat improve. *Id.* He also noted that she did not mention social anxiety and that she reported having many friends and attending church twice a week. *Id.*

Following the exam, Dr. Gardner concluded that Kimberly could perform simple, repetitive work tasks, maintain regular attendance in the workplace, perform work activities on a consistent basis, had normal intelligence, could perform work activities without special or additional supervision, and could complete a normal workday or workweek without interruptions from her psychiatric condition. R. 275. He also found that she could accept instructions from supervisors, interact with co-workers and the public with no more than a moderate impairment of social interaction due to her anxiety, and could deal with the usual stresses encountered in competitive work when adherent to treatment. *Id.*

On July 10, 2019, Kimberly had an appointment with Ms. Adkins, and she told Ms. Adkins that her anxiety had worsened over the past several weeks and that she had been feeling worried all the time with some episodes of panic. R. 296. Ms. Adkins advised her to seek counseling and prescribed Buspar. R. 298. On September 11, 2019, Kimberly stated that she had

stopped taking Buspar because it made her dizzy and she thought it made her anxiety worse. R. 994. She also reported that she had found cognitive behavioral therapy to be effective. *Id.* Ms. Adkins prescribed Ativan for Kimberly to use as needed. R. 996. On December 11, 2019, Kimberly expressed that Ativan was not effective for her, she was not sleeping, and she felt "irritated a lot." R. 1041. Christy Arthur, M.D., prescribed Paxil for generalized anxiety disorder. R. 1046. On January 13, 2020, Kimberly stated that had some improvement with Paxil, but still experienced excess worry. R. 1040. On February 24, 2020, she reported that her anxiety had improved on Paxil, R. 1031, and on April 20, 2020, she again reported improvement on the medicine, but still experienced situational anxiety in public places and excess worry. R. 1029.

State agency psychologist Jo McClain, Psy. D., reviewed Kimberly's records on September 11, 2019. R. 76. He found that her mental impairments were not severe and resulted in no more than mild limitations in the domains of understanding, remembering, or applying information; interacting with others; concentration, persistence or maintaining pace; and adapting or managing herself. R. 76–77. On November 13, 2019, state agency psychologist Daniel Walter, Psy. D., after reviewing Kimberly's records, agreed with Dr. McClain's conclusion that Kimberly's mental impairments were non-severe. R. 92.

## IV.    Analysis

Kimberly raises three objections to the R&R. Dkt. 23. First, she claims that the ALJ failed to provide the proper legal standard and substantial evidence to support his RFC's findings. *Id.* at 2–3. Second, she argues that substantial evidence does not support the ALJ's determination that her anxiety and PTSD are non-severe. *Id.* at 4–5. Third, she claims substantial evidence does not support the ALJ's determinations regarding her subjective allegations. *Id.* at 5. In its *de novo* review, the Court finds these objections lack merit.

### A.  Objection to the ALJ's Function-by-Function Analysis

Kimberly claims that the ALJ failed to provide the function-by-function analysis and the narrative discussion necessary to explain his RFC findings. Dkt. 23 at 2–3. She also claims that the ALJ's RFC findings were not supported by substantial evidence because of "significant contrary" evidence to his findings. *Id.* at 2. The Court finds that this objection lacks merit because the ALJ's decision provided a narrative discussion and substantial evidence supports his RFC findings.

Under SSR 96-8p, an RFC assessment "is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8P, 61 Fed. Reg. at 34476 (July 2, 1996). To comply with the function-by-function analysis, the ALJ must provide a narrative discussion describing "how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at 34478; *see also Mascio v. Colvin*, 780 F.3d. 632, 636 (4th Cir. 2015). The ALJ "must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis" and detail "the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." SSR 96-8P, 61 Fed. Reg. at 34478; *see also Monroe*, 826 F.3d at 189 (providing that "a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence" is a "necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling") (internal citations omitted). Ultimately, the ALJ must explain the conclusions reached and any inconsistencies or ambiguities in the evidence. *See* SSR 96-8P, 61 Fed. Reg. at 34478; *Monroe*, 826 F.3d at 189.

The Fourth Circuit has rejected a per se rule requiring remand when the ALJ fails to conduct a function-by-function analysis; instead, the Court has explained that "[r]emand may be

12

appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636 (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)); *see also Monroe*, 826 F.3d at 189 (noting that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion"). In *Mascio*, for example, the Fourth Circuit remanded the ALJ's decision in part because the ALJ failed to detail why the plaintiff had the ability to perform certain functions for a full workday and for failing to give weight to two RFC assessments that conflicted with each other. *See* 780 F.3d at 637.

Here, the ALJ complied with the function-by-function analysis by providing a narrative discussion that explains the conclusions he reached and any inconsistencies in the evidence. *See* SSR 96-8P, 61 Fed. Reg. at 34478. The ALJ cited objective medical evidence, such as Kimberly's medical history and medical opinions, R. 23–26, and nonmedical evidence, such Kimberly's testimony and her daily activities, R. 23, when determining his RFC findings. *See generally Mascio*, 780 F.3d. at 636.

The ALJ also complied with the narrative discussion by explaining inconsistencies between Kimberly's allegations that she had totally disabling symptoms and other evidence in the record. R. 28. He found that Kimberly's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.* In support of this conclusion, he explained that the record "reveals the treatment had been generally successful in controlling [her] symptoms," R. 28, and cited specific treatment measures that helped her symptoms, such as controlling her diabetes with medication and diet changes. R. 28–29. The ALJ also noted the following inconsistencies with her allegations: (1) she "reported caring for her children, preparing simple meals, shopping for

groceries and attending church;" (2) she did not consistently complain about and seek treatment for symptoms; and (2) "none of [Kimberly's] practitioners [] placed limitations on [Kimberly] or stated that she is unable to work." R. 29–30.

The ALJ further complied with the narrative discussion by detailing (1) Kimberly's ability to sustain work activities and (2) the maximum amount of time that she can perform each work-related activity. *See generally* SSR 96-8P, 61 Fed. Reg. at 34478. First, the ALJ discussed Kimberly's "ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis," *id.*, by stating that, despite her physical impairments, she had the RFC to perform light work and can lift or carry twenty pounds occasionally and ten pounds frequently. R. 22. The ALJ provided that she cannot perform past relevant work as a claims clerk and front office cashier, R. 30, but that she can perform jobs in the national economy, such as an usher, a furniture rental clerk, and a gate guard. R. 31. Second, the ALJ detailed "the maximum amount of each work-related activity [Kimberly] can perform," SSR 96-8P, 61 Fed. Reg. at 34478, by providing that she can sit, stand, or walk for six hours in an eight-hour workday; occasionally handle hand controls and items; occasionally finger items with both hands; "occasionally climb, balance, stoop, kneel, crouch and crawl;" and "occasionally work at unprotected heights, in humidity, in wetness, in extreme cold, and in vibration." R. 22–23.

In objecting to the function-by-function analysis, Kimberly specifically argues that the ALJ minimized evidence showing (1) that Kimberly's daily functioning activities of caring for her children, attending church, and grocery shopping were only performed intermittently or with assistance, *id.* at 2 (citing R. 60–61, 227–29), and (2) her "continued complaints of continued debilitating pain even with the Enbrel injections and other treatment," *id.* at 3 (citing R. 1067).

The Court finds substantial evidence to support the ALJ's RFC findings, and as such, will not reweigh this evidence.

Notably, the Court's review of this evidence is limited to determining whether the ALJ applied the appropriate legal standards and whether substantial evidence supports his RFC findings. *See Hancock*, 667 F.3d at 472, 476 (deciding that it would not reweigh evidence that was already considered by the ALJ in determining the plaintiff's adoptive functioning); *see also Bryan S. v. Kijakazi*, No. 7:20CV00358, 2021 WL 5278741, at *5 (W.D. Va. Aug. 4, 2021), *report and recommendation adopted*, No. 7:20-CV-00358, 2021 WL 4443061 (W.D. Va. Sept. 28, 2021) (providing that plaintiff's "citations to contradictory statements in the medical records amounts to his impermissibly asking the court to reweigh the evidence").

First, the ALJ weighed Kimberly's daily activities in assessing the RFC, determining that her ability to perform these activities did not align with Kimberly's complaints of disabling symptoms and limitations. R. 29. Even though the ALJ did not specifically note that Kimberly performed these daily activities intermediately or with assistance in its RFC assessment, his RFC findings were supported by other objective medical evidence and medical opinions, such as highlighting that none of the medical opinions recommended that Kimberly is unable to work, R. 30. Additionally, a reasonable mind could conclude from Kimberly being able perform those daily activities that she did not have a disabling symptom that prevents her from light work. *See generally Johnson*, 434 F.3d at 653. Because the ALJ's decision provides the appropriate narrative discussion and substantial evidence supports his RFC findings, the Court will not reweigh evidence of her daily activities. *See generally Hancock*, 667 F.3d at 472, 476.

Second, the ALJ weighed Kimberly's medical treatment history in determining the RFC findings. *See* R. 28 (finding that "treatment has been generally successful in controlling [her]

symptoms"); *see also* R. 28 (providing that "[t]wo injections of Enbrel a week seemed to control

her psoriasis"). Notably, the rheumatology treatment note cited by Kimberly does not fully

support her claim that she had "complaints of continued debilitating pain even with the Enbrel

injections and other treatment." Dkt. 23 at 3 (citing R. 1067). In March 2020, the note stated that

Kimberly had started Enbrel at the end of February and had seen improvement over the last

couple of weeks. R. 1067. As of June 2020, the note provided that she "had done very well on

Enbrel twice weekly but when reduced to once a week" she "had new spots on arms, legs" and

that once she switched back to two doses a week, she "had already noticed improvement." *Id.* By

September 1, 2020, the date of the treatment note, Kimberly reported that she had "ongoing

psoriasis on Enbrel twice a week" and that "[m]aybe the Enbrel ha[d] helped it be 'less

inflamed.'" *Id.*

  While she reported ongoing psoriasis with treatment in September 2020, her examination

at the time supported that these symptoms were not disabling because she could move all four

extremities without difficulty, could stand from a seated position without weaknesses, had a non-

antalgic gait and a good range of motion. R. 1073 (providing the examination results); *see also*

R. 29–30 (providing that the ALJ considered the physical examination results in assessing the

RFC findings). Accordingly, the two injections of Enbrel helped improve her symptoms in

March and June 2020, and while the treatment did not improve her psoriasis in September 2020,

her examination indicates that her symptoms did not cause the type of disabling intensity,

persistence, and limiting effects that Kimberly claims. *Id.*

  Additionally, the ALJ did not rely solely on the improvement of her psoriasis with

treatment in making his RFC findings; instead, he also weighed medical opinions, R. 30,

Kimberly's medical history, R. 28–29, her daily activities, R. 29, and her physical examination,

R. 29, in making his RFC findings. Based on medical opinions, medical history, physical examination, and daily activities evidence, the Court finds substantial evidence to support the ALJ's RFC findings. And, to the extent that the ALJ did not fully consider that she had continued symptoms with Enbrel in September 2020, the Court will not reweigh this evidence since the ALJ has substantial evidence to support his RFC findings. *See generally Hancock*, 667 F.3d at 472, 476.

In summary, the ALJ sufficiently provided a narrative discussion and substantial evidence to support his RFC findings by explaining his conclusions and inconsistencies in the evidence, as well as detailing Kimberly's ability to perform work activities. *See generally* SSR 96-8P, 61 Fed. Reg. at 34478. Thus, the Court finds that Kimberly's objection to the function-by-function analysis lacks merit.

### B.  Objection to the ALJ's Severe Impairment Finding

Next, Kimberly claims that substantial evidence does not support the ALJ's determination that her anxiety and PTSD are non-severe. Dkt. 23 at 4–5. The Court disagrees and finds substantial evidence to support the ALJ's determination on Kimberly's mental impairments being non-severe.

In step two of the standard five-step inquiry, the ALJ found Kimberly's mental impairments to be non-severe, noting that the "mental impairment of anxiety and [PTSD] do not cause more than minimal limitation" on Kimberly's "ability to perform basic mental work activities." R. 18. In making this determination, the ALJ reviewed the four broad functioning areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. R. 18–20 (citing the Listing of Impairments, 20 C.F.R., Pt. 4040, Subpart P, App. 1, 20 C.F.R. §§

404.1520(d), 404.1525, 404.1526). In reviewing Kimberly's medical history, her treatment history, and her daily activities, the ALJ concluded that Kimberly only had "mild limitations" for each functioning area. *Id.*

Kimberly specifically claims that the ALJ ignored evidence "documenting plaintiff's difficulty leaving her home and interacting with others as these activities increase[d] her anxiety." *Id.* at 4 (citing R. 230, 273, 416, 1029, 1038). However, the Court finds that the ALJ considered evidence that "she had trouble being in public with a large group" in assessing her ability to interact with others but found other evidence supported that her anxiety and PTSD caused only mild limitations for her ability to interact with others. R. 19. In making this conclusion, the ALJ specifically highlighted that Kimberly "reported going to Wal-Mart, shopping for groceries multiple times a month, or attending church twice a week" and "socializing with family both in and outside the home." R. 19. The ALJ also noted that the record generally shows that she "interacted normally with all providers when taking her psychiatric medication" and that "[p]roviders often noted [Kimberly] was pleasant, cooperative, and in no distress when taking her medication." R. 19. And while the ALJ did not specifically note all the evidence cited by Kimberly in her objection, such as Kimberly claiming in her function report that her children and husband helped with chores, R. 228–30, the ALJ still considered and evaluated evidence that she had trouble being in public. R. 19.

Importantly, the ALJ fulfilled its duty "to resolve conflicts in the evidence," *Hays*, 907 F.2d at 1456, by explaining why he found only mild limitations caused from her mental impairments, despite her subjective allegations of being anxious leaving her home. R. 19. Thus, since substantial evidence supports the ALJ's determination that Kimberly's mental impairments are non-severe, the Court decides that it will not reweigh evidence documenting that Kimberly

had difficulty leaving the house and interacting with others. *See generally Hancock*, 667 F.3d at 472, 476.

Kimberly also argues that the ALJ "never explained why he did not adopt Dr. Gardner's opinion that plaintiff ha[d] severe mental impairments of anxiety and PTSD." *Id.* But this claim inaccurately depicts the ALJ's decision because the ALJ adopted portions of Dr. Gardner's opinion and the ALJ explained why he did not adopt some of his opinion. R. 28. First, the ALJ, in step four of the standard five-step inquiry, found Dr. Gardner's opinion "persuasive because it was generally consistent with and supported by the mental evidence of the record." *Id.* The ALJ agreed with Dr. Gardner's opinion that Kimberly could "perform simple and repetitive work tasks" and "maintain regular attendance in the workplace." *Id.* But the ALJ did not adopt part of Dr. Gardner's opinion that noted Kimberly had *moderate* limitations in social interaction due to her anxiety disorder; instead, the ALJ found that she only had *mild* limitations in social interaction. *Id.* Second, the ALJ listed various reasons for why he did not adopt this part of Dr. Gardner's medical opinion stating that

> She had non-severe anxiety and PTSD with mild limitations in all of the "B" criteria. Her mental symptoms were usually controlled with medication at a primary care provider. Although she discussed starting cognitive behavioral therapy, there were no records of her attending any session. She had no psychiatric admissions. Mental status examinations were generally within normal limits. The claimant discussed giving birth and caring for a baby in May of 2018, working on a bachelor's degree in business administration, and having her own t-shirt company. Although she said she had anxiety around others, she was able to shop for groceries and attend church.

*Id.* Thus, the ALJ found parts of Dr. Gardner's opinion persuasive and detailed why he did not adopt all of Dr. Gardner's medical opinion. *Id.*

The ALJ considered Kimberly's medical records, her complaints, her daily activities, and medical opinions to find that her anxiety and PTSD caused mild limitations for her ability to perform basic mental work activities, concluding from this evidence that her mental impairments

19

were non-severe. *See* R. 17–21. Because substantial evidence supports the ALJ's determination

on Kimberly's mental impairments being non-severe, the Court finds that Kimberly's second

objection lacks merit.

### C.  Objection to the ALJ's Determination on Kimberly's Allegations

The ALJ determined that Kimberly's "statements concerning the intensity, persistence

and limiting effects of these symptoms [were] not entirely consistent with the medical evidence

and other evidence." R. 28. In her objections to the R&R, Kimberly argues that substantial

evidence does not support the ALJ's determination regarding her allegations. Dkt. 23 at 5. The

Court disagrees, finding that (1) the ALJ applied the appropriate two-step legal analysis and (2)

substantial evidence supports the ALJ's conclusion on Kimberly's allegations.

A reviewing court will uphold an ALJ's determination if (1) the ALJ applied the correct

legal standards and (2) substantial evidence supports the ALJ's findings. *See Pearson v. Colvin*,

810 F.3d 204, 207 (4th Cir. 2015); 42 U.S.C. § 405(g). The regulations require an ALJ to apply a

two-step analysis when evaluating a claimant's statements about her impairments and symptoms.

SR 16-3p, 2016 WL 1119029, at *4 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c),

416.929(b)–(c). First, an ALJ must consider "whether the individual has a medically

determinable impairment (MDI) that could reasonably be expected to produce the individual's

alleged symptoms." *Id.* Second, after finding an MDI, an ALJ must evaluate "the intensity and

persistence of an individual's symptoms . . . [to] determine the extent to which an individual's

symptoms limit his or her ability to perform work-related activities." SSR 16-3p, 2016 WL

1119029, at *4; §§ 404.1529(c), 416.929(c). At this step, "objective evidence is *not* required to

find the claimant disabled," *Arakas*, 983 F.3d at 95 (citing SSR 16-3p, 2016 WL 1119029, at *4–

5) (emphasis in original), and a claimant can "rely exclusively on subjective evidence" to prove

step two, *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006). Accordingly, in step two, the

ALJ must "examine the entire case record, including the objective medical evidence; an

individual's statements about the intensity, persistence, and limiting effects of symptoms;

statements and other information provided by medical sources and other persons; and any other

relevant evidence in the individual's case record." SSR 16-3p, 2016 WL 1119029, at *4.

Kimberly specifically cites *Arakas*, 983 F.3d 83 (4th Cir. 2020) to argue that the ALJ

"improperly discredited" Kimberly's allegations because they were not consistent with objective

evidence in the record. Dkt. 23 at 7. In *Arakas*, 983 F.3d at 95, the Fourth Circuit found that the

ALJ applied the incorrect legal standard when discounting the plaintiff's complaints about her

fibromyalgia because they were inconsistent with objective evidence. Even though the ALJ in

*Arakas* relied on other evidence in making his determination, the Circuit found that "his opinion

indicates that the lack of objective medical evidence was his chief, if not definitive, reason for

discounting [the plaintiff's] complaints." *Id.* at 97. The Circuit found that the ALJ imposed an

increased burden of proof on the plaintiff by requiring her to show that her subjective

descriptions were supported by objective medical evidence. *Id.* at 96 (citing *Lewis*, 858 F.3d at

866). The Circuit also noted that "ALJs may not rely on objective medical evidence (or the lack

thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints

regarding symptoms of *fibromyalgia or some other disease that does not produce such

evidence*." *Arakas*, 983 F.3d at 97 (emphasis added).

In the case at hand, the ALJ applied the correct legal standard by using the two-step

analysis and weighing Kimberly's complaints alongside the entire record, and the Court finds

substantial evidence to support the ALJ's determination on her allegations. *See* R. 23 (providing

ALJ's two-step analysis when considering Kimberly's allegations); *Pearson*, 810 F.3d at 207. At

step one, the ALJ found that Kimberly's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. 28. However, at step two, the ALJ evaluated Kimberly's allegations, medical evidence, medical professional opinions, and her daily activities to determine that her allegations were "not entirely consistent with" evidence in the entire record. R. 28–30. He concluded by finding that Kimberly could perform light work. *Id.*

During his analysis of step two, the ALJ relied on evidence in the entire record, including weighing Kimberly's allegations, to make his determination that she can perform work-related activities. *Id.* He noted that a physical examination showed she had a steady gait without the need of an assistive device and that her symptoms could be treated successfully based on her medical history. R. 28–29. Additionally, the ALJ highlighted that her activities of attending college for a bachelor's degree in the fall of 2017, caring for her children, shopping for groceries, and attending church indicated that her symptoms were not as disabling and limiting as alleged by Kimberly. R. 28–29. The ALJ further noted that none of the medical opinions provided by Kimberly's practitioners "stated that she is unable to work," R. 30, and that Kimberly had "not consistently complained of and sought treatment for symptoms related to her alleged impairments." R. 29.

While Kimberly analogizes her case with *Arakas*, 983 F.3d at 97, the Court finds the cases are unalike. The ALJ, as noted above, did not rely solely on objective medical evidence in finding that her allegations were not entirely consistent with the record; instead, he relied on various factors, such as Kimberly's medical treatment history, her daily activities, and medical opinions. *See* R. 30 (providing that the ALJ "acknowledges that pain and symptoms are not always accompanied by objective evidence and [he] will not disregard [Kimberly's] statements regarding symptoms solely due to a lack of objective evidence"); *see e.g.*, *Walker v. Saul*, No.

2:20-cv-00196, 021 WL 342570, at *10 (S.D.W. Va. Jan. 6, 2021) (providing that "the ALJ did not discount [c]laimant's subjective complaints based on the lack of objective evidence, but instead properly considered numerous factors, including [c]laimant's daily activities"). Based on Kimberly's medical treatment notes that document her physical symptoms, Kimberly's impairments do not possess a "unique nature" like fibromyalgia, in which the symptoms can only be assessed on subjective allegations. *Arakas*, 983 F.3d at 97. Furthermore, the ALJ considered that Kimberly experienced pain from her impairments in his RFC findings by concluding that she could perform only light work and by placing specific restrictions on her ability to operate hand controls, handle items, and finger items. *See* R. 22 (noting that she "can operate hand controls, [handle items, and finger items] with the left hand and right hand *occasionally*") (emphasis added). Thus, the ALJ properly applied the two-step analysis, and substantial evidence supports the ALJ's determination on Kimberly's allegations.

Lastly, Kimberly argues that her case is not distinguishable from *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251 (4th Cir. 2017), arguing that the ALJ failed to "provide how the activities he cites establish plaintiff can perform substantial gainful work activities on a sustained basis over the course of an eight-hour workday." Dkt. 23 at 7. In *Brown*, the Fourth Circuit found that the ALJ failed to "build an accurate and logical bridge from the evidence to his conclusion that [the claimant's] testimony was not credible." *Brown*, 873 F.3d at 269 (citing *Monroe*, 826 F.3d at 189 (internal quotation marks omitted)). In *Brown*, the ALJ found that the plaintiff's statements about the limiting effects of his pain were inconsistent with his testimony about his daily activities of going cooking, driving, doing laundry, collecting coins, attending church, and shopping. *Id.* at 269. According to the Fourth Circuit, the ALJ failed to "acknowledge the limited extent of those activities as described by [the plaintiff] or explain how those activities showed

that he could sustain a full-time job." *Id.* The Circuit also noted that the record did not support

the "ALJ's suggestion that [the plaintiff] was regularly exercising and doing housework and car

repairs," and that the ALJ improperly relied on his own observations during the hearing in

making his decision. *Id.* at 270.

Unlike *Brown*, the ALJ "built an accurate and logical bridge" from the evidence in the

record to his conclusion that Kimberly could light work for an eight-hour day. *Monroe*, 826 F.3d

at 189 (internal quotation marks omitted). In making his RFC findings, the ALJ evaluated her

daily activities by providing

> The claimant reported giving birth to a child and caring for a newborn in May of 2018
> (Exhibit 3F). She also mentioned attending college for a bachelor's degree in business
> administration to her endocrinologist in the fall of 2017 (Exhibit 3F). In addition, she
> mentioned having her own company designing t-shirts to her endocrinologist in 2017 and
> 2018 (Exhibit 3F). The claimant reported caring for her children, preparing simple meals,
> shopping for groceries, and attending church in her function report (Exhibit 7E). Given
> the complaints of disabling symptoms and limitations, such activities are not limited to
> the extent one would expect.

R. 29. He concluded that Kimberly's allegations about her disabling symptoms did not fully

align with her daily activities. *Id.* The ALJ also evaluated other evidence in determining that

Kimberly could perform light work with certain limitations for an eight-hour workday. R. 28–30.

He considered medical opinion evidence that did not recommend placing any limitations on

Kimberly's ability to work, R. 30, her medical history, R. 28–29, and her "physical examination

results show[ing] mild abnormalities for diabetes mellitus, lumbago, psoriasis, and

osteoarthritis," R. 30. Thus, the ALJ provided a logical bridge to his conclusion in determining

that Kimberly could perform light work. *See Monroe*, 826 F.3d at 189.

Importantly, a reviewing court must give "great weight" to the ALJ's observations of a

claimant's credibility since the ALJ had "the opportunity to observe the demeanor and to

determine the credibility of the claimant." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In cases, in which an ALJ's "factual findings rest[ed] upon credibility determinations," a reviewing court should accept such determinations absent "'exceptional circumstances.'" *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997) (quoting *NLRB v. Air Products & Chemicals, Inc.,* 717 F.2d 141, 145 (4th Cir. 1983)). Exceptional circumstances include cases in which an ALJ's credibility finding "is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Id.* (internal quotation marks omitted). In the case at hand, the ALJ provided medical evidence and other evidence to support his determination that Kimberly's allegations were inconsistent with the record as discussed above. The ALJ's credibility determination was not "unreasonable," contradicting to other evidence, or based on inadequate reasoning. *See id.* The Court thus defers to the ALJ's determination on Kimberly's credibility and will not reweigh Kimberly's allegations.

Because substantial evidence supports the ALJ's conclusion on Kimberly's allegations and the ALJ applied the appropriate two-step legal analysis, the Court finds that Kimberly's last objection lacks merit and is overruled.

## V.    Conclusion

For the foregoing reasons, Plaintiff's objections to the R&R will be overruled and the Court will adopt Judge Ballou's R&R in full. The Court will issue an accompanying order.

The Clerk of Court is directed to send a copy of this memorandum opinion to all counsel of record.

ENTERED this __30th__ day of September, 2022.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE